UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Duane Larson, Ron Morris, Jr., Robert Cogger, and Tom Fisher, individually, and on behalf of all others similarly situated,

Plaintiffs,

v.

Burlington Northern & Santa Fe Railway Company,

Defendant.

Civil No. 01-527 (RHK/RLE)

**MEMORANDUM OPINION AND ORDER**

---

Robert J. King, Jr., and Russell A. Ingebritson, Ingebritson & Associates, L.L.P., Minneapolis, Minnesota; Philip G. Arnold, Ingebritson & Associates, L.L.P., Seattle, Washington; and Richard Lockridge, Lockridge, Grindel & Nauen, P.L.L.P., Minneapolis, Minnesota, for Plaintiffs.

Weston W. Marsh, Freeborn & Peters, Chicago, Illinois; and Edward M. Glennon, Lindquist & Vennum, P.L.L.P., Minneapolis, Minnesota, for Defendant.

---

## Introduction

Between August 1992 and October 1998, Duane Larson, Ron Morris, Jr., Robert Cogger, and Tom Fisher (collectively "Plaintiffs") each signed a release and received a monetary payment from Defendant Burlington Northern & Santa Fe Railway Company ("BNSF") to settle potential claims arising from work-related noise-induced hearing loss ("NIHL"). In this lawsuit, Plaintiffs allege that, while negotiating the release of their



FILED JAN 10 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

NIHL claims, BNSF's claims representatives told them that (a) retaining a lawyer would not do them any good because the value of their claims was capped by a formula, and (b) they would receive the same monetary settlement for their claims as all other BNSF employees with comparable hearing loss claims. As a result of such representations, Plaintiffs claim, BNSF obtained their signatures on the releases.

Plaintiffs now complain that they received "unfair and extraordinarily low" settlement payments that were far less than those received by BNSF employees with "comparable" hearing loss claims who were represented by counsel.[1] Thus, Plaintiffs claim, BNSF obtained the settlement of their NIHL claims through fraud. Plaintiffs seek to have the releases set aside so that they may proceed with hearing loss claims under the Federal Employers Liability Act ("FELA") or, alternatively, to obtain the "benefit of the bargain" they believed they had negotiated for when they settled their claims with BNSF – i.e., the same sums of money that BNSF employees who were represented by counsel received for their NIHL claims.

Before the Court is BNSF's Motion to Dismiss the Amended Class Action Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] For the

---

[1] Plaintiffs bring this action on behalf of themselves and all other BNSF employees who, between January 1, 1988 and the present, settled their NIHL claims on a direct or unrepresented basis -- that is, without legal counsel. Plaintiffs believe that the class consists of over 7000 BNSF employees.

[2] BNSF previously moved to dismiss the Plaintiffs' initial class action complaint. After briefing on that motion was completed, however, Plaintiffs amended their

reasons set forth below, BNSF's motion to dismiss the Amended Class Action Complaint is granted in part and denied in part.

## Background

### I. The Scope of the Record Before the Court

On a motion to dismiss, the factual record before the district court includes the facts alleged in the complaint, which are assumed to be true. Cooper v. Pate, 378 U.S. 546 (1964) (per curiam) (holding that, on a motion to dismiss pursuant to Rule 12(b)(6), the district court must take as true the factual allegations contained in the complaint). In ruling on its motion, BNSF urges the Court also to consider several other documents, including the Plaintiffs' signed releases and hearing loss calculation worksheets prepared by BNSF for the Plaintiffs at the time of their settlements.

Generally, a court may not consider "matters outside the pleadings" on a Rule 12(b)(6) motion to dismiss without converting that motion to one for summary judgment. Fed. R. 12(b)(6). The Eighth Circuit has "interpreted the phrase 'matters outside the pleadings' to include 'any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings.'" Hamm v. Rhone-Poulenc Rorer Pharms., Inc., 187 F.3d 941, 948 (8th Cir. 1999) (quoting Gibb v. Scott, 958 F.2d 814, 816 (8th Cir. 1992)), cert. denied, 528

---

Complaint as a matter of course, without leave of the Court, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure. Defendant's motion to dismiss the initial complaint was therefore rendered moot.

U.S. 1117 (2000). The Eighth Circuit has also stated, however, that "[s]ome materials that are part of the public record or do not contradict the complaint may be considered by a court in deciding a Rule 12(b)(6) motion to dismiss." Missouri ex rel. Nixon v. Coeur D'Alene Tribe, 164 F.3d 1102, 1107 (8th Cir.) (citations omitted), cert. denied, 527 U.S. 1039 (1999). The Court concludes that the documents submitted as exhibits A through E and H through J to the September 17, 2001 Affidavit of Douglas A. Albritton (Doc. No. 35) do not contradict the Plaintiffs' Amended Complaint and shall be considered. The remaining exhibits -- Minnesota and North Dakota workers' compensation schedules for hearing loss claims, and a newspaper advertisement – are clearly "matters outside the pleadings" and therefore will not be considered

## II. BNSF's NIHL Claim Resolution Procedures

For several decades, Plaintiffs were exposed to excessively loud levels of noise in the workplace. (Amended Compl. ¶ 23.) Responding to numerous NIHL claims filed by employees under the FELA in the late 1980s, BNSF and its predecessor companies[3] developed standardized nationwide practices for resolving such claims. (Id. ¶¶ 14, 28.) Plaintiffs assert that, through these claims practices, BNSF "fostered and encouraged a relationship of trust and confidence between its experienced, informed and skilled claims personnel, on the one hand, and its employees, on the other hand, who were generally

[3] The Amended Complaint identifies three railroads as the principal corporate predecessors of BNSF: the Great Northern Railroad, the Northern Pacific Railroad, and the Atchison, Topeka & Santa Fe Railway. (Amended Compl. ¶ 6.)

inexperienced, uninformed, and unskilled in claims practices, especially as related to the understanding and evaluation of [NIHL] claims."[4] (Id. ¶ 32.)

The BNSF claims representatives allegedly repeatedly told Plaintiffs and members of the class that

> it was not in their best interest to retain independent legal counsel because, represented or not, all employee's claims were governed according to the same "formula," "chart," "table," or "guideline," and that the employee could trust Defendant to settle his claim fairly and equitably and in accordance with the manner in which other claimants had been treated.

(Id. ¶ 43.) BNSF created a number of "simultaneously utilized, but widely varying, settlement matrixes" that instilled "a false impression of authenticity, fairness, and uniformity to the claims process offered" to employees who were unrepresented by counsel. (Id. ¶ 44; see generally id. ¶¶ 46-70, 78-80.) Claims representatives for BNSF used these matrixes to persuade unrepresented employees that their NIHL claims "had an established or pre-determined value pursuant to what was authoritatively referred to as the 'AMA guidelines,' 'formula,' 'chart,' 'guidelines,' or 'federal guidelines.'"[5] (Id. ¶ 44.)

---

[4] Specifically, Plaintiffs allege that BNSF published and disseminated publications such as "If You're Injured on the Job . . . Let us Help," that were "intended to foster a relationship of trust and confidence between claims agents and claimants" so that injured employees would be induced "to forego legal representation and to accept Defendant's assurances and representations regarding the nature and value of their hearing loss claims." (Id. ¶¶ 33, 34 and Ex. 4.)

[5] Plaintiffs complain that, from at least late 1991 or early 1992 and continuing until the present, BNSF has represented on its "Hearing Loss Calculation Worksheet" that there is an "AMA Value" (expressed in dollars) that corresponds to the employee's hearing loss. Thus, BNSF has sought to convince employees that the American Medical

Plaintiffs complain that none of the schedules or guidelines employed in connection with their NIHL claims "fairly and accurately represents the elements of damages properly compensable to hearing impaired railroad employees under the [FELA]." (Id. ¶ 81.)

Plaintiffs allege that BNSF developed its claims practices "to wrongfully deprive Plaintiffs and class members of the benefit of effective legal counsel and to unlawfully deprive Plaintiffs and class members of fair, reasonable, and adequate compensation for their noise induced hearing loss." (Id. ¶ 19.) Furthermore, Plaintiffs assert, BNSF has brought declaratory judgment actions seeking insurance coverage from numerous insurance companies for damages payable to BNSF's employees on hearing loss claims. (See id. Exs. 2 & 3.) Plaintiffs allege that the goal of BNSF's allegedly fraudulent claims practices was to minimize BNSF's obligation to pay claims so that it could retain as much of the moneys received from insurance companies as possible.

## III. The Plaintiffs' Settlements with BNSF

### A. Duane Larson

Duane Larson is a resident of Breckinridge, Minnesota, and has been employed by BNSF as a clerk-agent-operator since April 1967. (Id., ¶ 115.) In August 1992, BNSF tested Larson's hearing and informed him by letter that his test had indicated a "change" in his hearing and that he was "strongly urged to wear ear protection at all times in noise."

---

Association has determined the nature and extent of the employee's noise induced hearing loss and the value of the employee's claim.

(Id. ¶ 116.) He was also directed to contact clerk Muriel Saign. (Id.) Saign directed Larson to contact claims agent William Renney, who would "take care of him." (Id.)

Larson spoke to Renney by telephone and was told that Renney would evaluate Larson's hearing loss claim based upon the railroad's hearing tests. (Id. ¶ 118.) Larson and Renney scheduled an appointment to meet in Renney's office in Fargo, North Dakota. (Id.) During the telephone conversation and the subsequent meeting in Renney's office, Renney told Larson that:

- Renney had handled and settled numerous NIHL claims and had extensive experience and knowledge concerning such claims.
- There was a formula for determining the value of Larson's claim and the formula applied to everyone.
- Retaining an attorney would not do Larson any good because these claims were "cut and dried"; the formula told what Larson would get regardless of whether he had an attorney.
- The settlement was in Larson's best interest because it was the best he could get under any circumstance, given the fact that the formula applied no matter what.

(Id. ¶¶ 117, 119, 123.)

In front of Larson, Renney used a notebook and a chart to fill in numbers on a worksheet to determine the settlement value of Larson's claim. (Id. ¶ 120.) In so doing, Renney talked to Larson about the "AMA" and what the "AMA showed for his loss and the amount he should receive." (Id.) Larson understood the "AMA" to be a reference to the American Medical Association. (Id.) Renney told Larson that, based on the "formula," he was entitled to receive $3000 for his high frequency hearing loss. (Id. ¶

121.) Renney added that, because Larson had also suffered some low frequency hearing loss, he would receive another $1000. (Id.) Larson believed that there was nothing to negotiate or discuss because the amount was determined by the chart. (Id.)

Renney drew up a release, which Larson signed, and gave Larson a check. (Id.) Renney also gave Larson a stack of documents which Larson took home with him. (Id. ¶ 124.) Included in that stack was a "Hearing Loss Calculation Worksheet."[6] (Id.) Larson complains that Renney failed to disclose, inter alia, that other company-generated settlement matrixes existed which, if used, would have entitled him to many times the amount he received from BNSF. (Id. ¶ 125.)

**B. Ron Morris, Jr.**

Ronald A. Morris, Jr. is a resident of Grand Forks, North Dakota, and has been employed by BNSF in the track department since 1978. (Id., ¶ 104.) In 1998, BNSF tested his hearing and informed him by letter that there were signs of NIHL. (Id.) Morris telephoned claims agent William Renney to ask about filing a hearing loss claim and was told to obtain and fill out a Personal Injury Report. (Id.) Morris went to his roadmaster, who filled out the report for Morris's signature because Morris did not know how to answer some of the questions. (Id.) "Pursuant to Renney's assurances," Morris submitted his Personal Injury Report to Renney. (Id. ¶ 107.) Renney telephoned Morris – whether before or after Morris submitted his claim is unclear – to discuss the hearing loss claim.

[6] That document is attached as Exhibit 8 to the Amended Complaint.

(Id. ¶ 105.) Furthermore, during Renney's telephone conversations with Morris, Renney made the following representations:

- It was Renney's job to be fair and honest with claimants.
- Renney handled and settled numerous hearing loss claims and knew what he was doing.
- Morris would be treated the same as everyone else at BNSF.
- Renney was in Morris's corner and would do the best possible for him.
- Time was running out for BNSF to pay any money to Morris for his hearing loss.
- Retaining an attorney would not be in Morris's best interest
- There was a formula for determining the value of Morris's claim that was "system-wide" and applied equally to everyone, whether or not they had an attorney.
- The formula applied even if Morris had an attorney and, therefore, he'd be wasting 25% of his money if he hired an attorney.

(Id. ¶¶ 106, 108.) Renney presented himself as a "friend" of or "buddy" to Morris. (Id. ¶ 106.)

Renney told Morris on the telephone that, based upon the "formula," Morris was entitled to receive $2000 for his hearing loss claim. (Id. ¶ 109.) Morris asked to see the formula and Renney mailed it to him.[7] (Id.) In the letter accompanying the formula, Renney indicated that Morris was entitled to a settlement of $2000, but that Renney was raising that amount to $3000. (Id.) Morris called Renney and said he would accept the $3000 settlement. (Id. ¶ 110.) Morris complains that Renney failed to disclose, inter

---

[7] That document is attached as Exhibit 9 to the Amended Complaint.

alia, that other company-generated settlement matrixes existed which, if used, would have entitled him to many times the amount he received from BNSF. (Id. ¶ 112.)

### C. Robert Cogger

Robert Cogger is a resident of Hibbing, Minnesota, and has been employed by BNSF in its track department since 1976. (Id. ¶ 128.) In 1992, BNSF tested Cogger's hearing. (Id.) Following those tests, John Herlick, a claims agent for BNSF contacted Cogger to discuss a settlement for Cogger's NIHL claim. (Id.) Herlick went to Cogger's home to meet him. (Id.) In the course of discussing Cogger's claim, Herlick made the following representations to Cogger:

- Herlick had experience with hearing loss claims, and Cogger could trust him.
- A chart Herlick had brought with him to the meeting represented the amount Cogger could receive in settlement of his claim.
- The chart applied to everyone.
- Even with an attorney, Cogger would not be entitled to any more compensation because the chart applied to everyone. Getting an attorney would be a waste of money because the settlement amount Cogger was entitled to was determined by the chart.
- Cogger's hearing loss claim was "cut and dried."
- Herlick was doing "the best he could do for him."
- The amount of the settlement represented a "fair settlement."

(Id. ¶¶ 128-29.)

Herlick told Cogger that, based upon the chart, he was entitled to a settlement of $1200. (Id. ¶ 129.) When Cogger questioned whether he ought to be entitled to more

compensation, Herlick referred to the chart and said that Cogger could not get any more money under the graph. (Id.) Cogger agreed to the settlement and signed the release Herlick presented to him. (Id. ¶ 130.) Cogger complains that Herlick failed to tell him that the chart did not, in fact, govern the value of his claim, and there were other settlement matrixes that would have provided Cogger many times the compensation he received. (Id. ¶ 132.)

**D. Tom Fisher**

Thomas E. Fisher is a resident of Hibbing, Minnesota, and has been employed by BNSF in its track department since 1974. (Id. ¶ 133.) BNSF tested Fisher's hearing for several years. (Id.) In about April 1993, Fisher underwent further testing of his hearing which demonstrated that he was suffering from severe noise induced hearing loss and tinnitus (ringing in the ears). (Id.) In August 1993, Fisher telephoned BNSF claims agent Jeff Johnson. (Id. ¶ 134.) Fisher told Johnson that he believed he might have a hearing loss claim. (Id.) Johnson sent forms to Fisher that he completed and returned to Johnson. (Id.) Johnson then arranged a meeting with Fisher to discuss his hearing loss claim.

At the meeting, Johnson referred to a piece of paper and explained to Fisher what he was entitled to receive. (Id. ¶ 135.) Johnson referred to the information on this piece of paper as the "'AMA standard of value' or something similar to that." (Id.) During the meeting Johnson made the following representations to Fisher:

- Johnson had handled many hearing loss claims and knew what he was doing.
- The AMA standards that he was using applied to everyone on the railroad equally, whether or not they were represented by an attorney.
- The AMA value represented the "cap" on Fisher's claim. The AMA value was "it"; "this is all you can get."
- A lawyer would not do Fisher any good and would only take money for a fee, which was really Fisher's money.

(Id. ¶¶ 135-36.)

Johnson told Fisher that the "AMA standard of value" stated that his claim was worth $3000; that was all Fisher could get and that Johnson was allowed to pay. (Id. ¶ 135.) Fisher accepted the $3000 settlement. (Id. ¶ 136.) Johnson drafted a release that Fisher signed. (Id.) Johnson then gave Fisher his check. (Id.) Fisher complains that Johnson failed to disclose, inter alia, that the chart Johnson had in front of him did not, in fact, govern the value of his claim, and there were other settlement matrixes that would have provided Fisher many times the compensation he received. (Id. ¶ 139.)

## Analysis

### I. Standard of Decision

In considering a motion to dismiss for failure to state a claim upon which relief may be granted, a complaint

> must be viewed in the light most favorable to the plaintiff and should not be dismissed merely because the court doubts that a plaintiff will be able to prove all of the necessary factual allegations. "Thus, as a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the

complaint that there is some insuperable bar to relief."

Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982) (quoting Jackson Sawmill Co. v. United States, 580 F.2d 302, 306 (8th Cir. 1978)). Viewing the complaint in this manner, the court may dismiss a case under Rule 12(b)(6) only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Hishon v. King & Spalding, 467 U.S. 67, 73 (1984) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

The Amended Complaint consists of both individual claims relating to the four Plaintiffs and class allegations. BNSF has moved to dismiss only the individual claims of the four Plaintiffs, given that there has been no certification of this action as a class action under Rule 23 of the Federal Rules of Civil Procedure. (Def.'s Mem. Supp. Mot. to Dismiss at 1, n.1.) Plaintiffs have asserted a claim of FELA negligence against the railroad, together with several claims under, alternatively, the "federal common law" and state common law: (a) breach of fiduciary duty; (b) fraud, constructive fraud, and misrepresentation; (c) negligent misrepresentation; (d) failure to disclose material facts (i.e., breach of a duty of candor); (e) fraudulent concealment; (f) equitable estoppel; (g) promissory estoppel; (h) specific performance; (i) breach of contract; (j) unjust enrichment; and (k) rescission. The Court begins with the Plaintiffs' claims that the releases they signed should be ruled invalid and set aside.

## II. Plaintiffs' Challenge to the Validity of the Releases

In enacting the FELA, Congress included a provision voiding any contract that enables a common carrier to "exempt itself from any liability created by this chapter." 45 U.S.C. § 55. Over fifty years ago, however, the Supreme Court held that "a release is not a device to exempt from liability but is a means of compromising a claimed liability . . . . Where controversies exist as to whether there is liability, and if so for how much, Congress has not said that parties may not settle their claims without litigation." Callen v. Pennsylvania R.R. Co., 332 U.S. 625, 631 (1948) (emphasis added). Four years later, the Supreme Court stated that "[r]eleases and other devices designed to liquidate or defeat injured employees' claims play an important part in the [FELA's] administration." Dice v. Akron, Canton & Youngstown R.R. Co., 342 U.S. 359, 361-62 (1952). The validity of releases under the FELA "raises a federal question to be determined by federal rather than state law." Id. at 361; accord Maynard v. Durham & S. Ry., 365 U.S. 160, 161 (1961).

Federal law recognizes three grounds for invalidating a FELA release. ***First***, "a release of rights under the [FELA] is void when the employee is induced to sign it by the deliberately false and material statements of the railroad's authorized representatives made to deceive the employee as to the contents of the release." Dice, 342 U.S. at 362. ***Second***, a mutual mistake of fact pertaining to a present existing fact or a past fact – i.e., a fact going to the nature or extent of the employee's injury – will invalidate the release of a FELA claim. See Callen, 332 U.S. at 628-29; Locke v. Atchison, Topeka & Santa Fe

Ry. Co., 309 F.2d 811, 816 (10th Cir. 1962); Manis v. CSX Transp., Inc., 806 F. Supp. 177, 179 (N.D. Ohio 1992) (quoting Loose v. Consolidated Rail Corp., 534 F. Supp. 260, 263 (E.D. Pa.), aff'd, 692 F.2d 749 (3rd Cir.1982) (table)). ***Third***, a release of claims under the FELA can be set aside for inadequate consideration: "A release is not supported by sufficient consideration unless something of value is received to which the creditor had no previous right." Maynard, 365 U.S. at 163 (quoting Burns v. Northern Pac. Ry. Co., 134 F.2d 766, 770 (8th Cir. 1943)).

Plaintiffs claim that BNSF obtained the releases from them through fraudulent misrepresentations and omissions made by BNSF's claims representatives.[8] Plaintiffs specifically contend that, because a fiduciary relationship existed between them and BNSF, the railroad should bear the burden of proving that the releases are valid, as opposed to the Plaintiffs being required to show that the releases are invalid. Plaintiffs also contend that the releases should be set aside because BNSF's claim representatives failed to use adequate care in communicating to them information relevant to the settlement of their NIHL claims; i.e., negligently misrepresenting material facts pertaining to the releases.[9] Before addressing the various grounds on which Plaintiffs seek to invalidate the releases, the Court begins with the issue of who bears the burden of

---

[8] Plaintiffs do not contend that the releases are invalid due to lack of consideration or mutual mistake.

[9] These allegations are embodied in Count Four of the Amended Complaint

proof regarding the releases' validity.

### A. The Burden of Proof Regarding Validity of the Releases

In 1948, the Supreme Court held that, in FELA cases,

> the releases of railroad employees stand on the same basis as the releases of others. One who attacks a settlement must bear the burden of showing that the contract he has made is tainted with invalidity, either by fraud practiced upon him or by a mutual mistake under which both parties acted.

Callen, 332 U.S. at 630 (emphasis added). BNSF cites this rule but does not address Plaintiffs' argument that a fiduciary relationship between the settling parties gives rise to an exception to it. The Court therefore examines the authority cited by Plaintiffs to support their contention that "a common law exception applies to the general FELA rule that the party attacking the validity of a release bears the burden of proof." (Pls.' Mem. Opp'n Mot. to Dismiss at 18.)

Plaintiffs rely primarily upon an unreported decision of the United States Court of Appeals for the Ninth Circuit, Ellenson v. Burlington Northern, Inc., No. 85-4119 (9th Cir. Jan. 9, 1987). The Rules of the Ninth Circuit Court of Appeals state, however, that unreported decisions of that court do not have precedential value. Ninth Cir. Rule 36-3.[10]

---

[10] There is an exception to the Ninth Circuit rule for citations made under the doctrines of law of the case, res judicata, or collateral estoppel. None of those doctrines applies here. In Ellenson, the Ninth Circuit observed that, at trial and again on appeal, the railroad had "admitted to having a fiduciary relationship with Mr. Ellenson." (slip op. at 2-3 (emphasis added).) There is no suggestion in Ellenson that the Ninth Circuit either considered or decided the broader issue of whether BNSF had a fiduciary relationship with other employees, such as the Plaintiffs here.

Even if the Court considered the Ellenson decision, however, the reasoning underlying that court's holding is not persuasive. Ellenson itself relied for authority on the Supreme Court's decision in Garrett v. Moore-McCormack Co., 317 U.S. 239 (1942), focusing (as do the Plaintiffs here) on the following passage:

> Whether the transaction under consideration is a contract, sale, or gift between guardian and ward or between trustee and cestui, the burden of proving its validity is on the fiduciary. He must affirmatively show that no advantage has been taken; and the burden is particularly heavy where there has been inadequacy of consideration.

Garrett, 317 U.S. at 247. Unfortunately, this passage is dicta, and Garrett is not persuasive authority in the context of FELA releases.

Garrett involved the validity of a release entered into by a seaman following an injury he allegedly sustained as a result of the shipowner's negligence. The seaman sued in state court asserting claims under the federal Jones Act and federal admiralty law. The state trial court entered judgment in favor of the shipowner, notwithstanding the jury's verdict in favor of the seaman, on the grounds that the seaman had failed to sustain the burden of proof defined by state law for invalidating the release.[11] That decision was sustained by the Pennsylvania Supreme Court. The United States Supreme Court,

[11] The trial court had conceded that "in Admiralty cases, the responsibility is on the defendant to sustain a release rather than on a plaintiff to overcome it, but concluded that since petitioner had chosen to bring his action in a state rather than in an admiralty court, his case must be governed by local, rather than admiralty principles." Garrett, 317 U.S. at 242 (internal quotation marks omitted).

however, concluded that "[a] seaman in admiralty who attacks a release has no such burden imposed upon him as that to which the Pennsylvania rule subjects him," Garrett, 317 U.S. at 246. Rather, the Supreme Court held, "the burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights." Id. at 248.

Central to the Supreme Court's reasoning in Garrett was the fact that Congress and the courts have long treated seamen as "wards of the admiralty."

> The language of Justice Story, sitting on Circuit in 1823, described the solicitude with which admiralty has traditionally viewed seamen's contracts:
>
> > They are emphatically the wards of the admiralty; and though not technically incapable of entering into a valid contract, they are treated in the same manner, as courts of equity are accustomed to treat young heirs, dealing with their expectancies, wards with their guardians, and cestuis que trust with their trustees. * * * If there is any undue inequality in the terms, any disproportion in the bargain, any sacrifice of rights on one side, which are not compensated by extraordinary benefits on the other, the judicial interpretation of the transaction, is that the bargain is unjust and unreasonable, that advantage has been taken of the situation of the weaker party, and that pro tanto the bargain ought to be set aside as inequitable. * * * And on every occasion the court expects to be satisfied, that the compensation for every material alteration is entirely adequate to the diminution of right or privilege on the part of the seamen.

Garrett, 317 U.S. at 246-47 (citations omitted). Justice Black, writing for the Court, also recognized that Congress had manifested its intent to protect seamen by expressly providing that a seamen's releases in respect to wages "must be signed by a seaman in the presence of a shipping commissioner . . . . General Congressional policy is further shown

in the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 915, 916, in which all releases not made under the express terms of the Act are declared invalid." Id. at 247. The Supreme Court therefore concluded that

> [t]he wardship theory has, as was recognized by the courts below, marked consequence on the treatment given seamen's releases. Such releases are subject to careful scrutiny. "One who claims that a seaman has signed away his rights to what in law is due him must be prepared to take the burden of sustaining the release as fairly made with and fully comprehended by the seaman."

Id. at 247-48 (quoting Harmon v. United States, 59 F.2d 372, 373 (5th Cir. 1932)). Thus, the Garrett opinion highlights the fact that seamen, as "wards of the admiralty," had been (and would continue to be) uniquely protected by Congress and the courts against the overreaching of shipowners who would abuse their superior bargaining power and would take advantage of their seamen.

Six years after the Garrett opinion, the Supreme Court decided Callen v. Pennsylvania Railroad Co. In reaching its holding that the burden of proof rests with the party challenging the FELA release, the Court expressly rejected an argument by amicus curiae that, due to the inequality of the bargaining power as between the railroad and employee Callen, the railroad should bear the burden of proving that the release Callen had signed was valid. Callen, 332 U.S. at 630. Justice Black, author of the opinion in Garrett, dissented in Callen, "being of the view that releases under the [FELA] should be governed by the same rule which applies to releases by seamen in admiralty." Id. at 631.

The issue of whether the burden of proof applicable to contracts between fiduciaries and beneficiaries should apply to FELA releases was before the Supreme Court over fifty years ago and was rejected without exception. The Ninth Circuit in Ellenson, and the Plaintiffs here, plucked a passage from the Garrett opinion out of context, without considering either the nature of the Supreme Court's holding in that case or the relationship between that holding and the Court's subsequent holding in Callen.

Plaintiffs have not established the existence of a federal common law exception to the rule articulated in Callen that the party attacking the validity of a FELA release bears the burden of proving the release to be invalid. Plaintiffs have not cited to any federal court decision, other than Ellenson, that shifts the burden of proof in a FELA case from the party attacking the validity of a release to the proponent of the release on the grounds that a fiduciary relationship exists between the railroad and its employee. This Court has not found any such authority and declines to create such a rule of law. Plaintiffs bear the burden of proving the invalidity of the releases they signed. The Court therefore turns to whether their claim that the releases must be set aside for fraud can withstand BNSF's motion to dismiss.

### B. Voiding FELA Releases for Fraud

Plaintiffs claim that BNSF obtained releases from them as a result of fraudulent misrepresentations made by the railroad's claims representatives. Specifically, they allege that the claims representatives made false statements which deceived them into

believing that (1) they did not need to retain a lawyer, and (2) their NIHL claims were going to be treated the same as the claims of all other similarly situated BNSF employees.[12] Based on these allegedly false representations, Plaintiffs contend, they signed the releases.

BNSF argues that Plaintiffs do not state a claim for fraud that would invalidate the FELA releases because the misrepresentations they have alleged do not go to the contents of the releases. Plaintiffs respond that the realm of fraudulent statements that will void a FELA release is not limited to misrepresentations going to the contents of the release; Plaintiffs contend that "fraudulent inducement" is an independent common law basis for voiding a release, regardless of whether the fraud related to the contents of the release. The parties have framed their dispute around the meaning of the Supreme Court's holding in Dice v. Akron, Canton & Youngstown Railroad Co.

### 1. Allegations of fraud that will void a FELA release

In support of its argument that only fraudulent misrepresentations going to the contents of the FELA release will void the release, BNSF relies on the following language from Dice v. Akron, Canton & Youngstown Railroad Co.:

> We hold that the correct federal rule is that . . . a release of rights under the [FELA] is void when the employee is induced to sign it by the deliberately

---

[12] The claims in the Amended Complaint embodying this legal theory are Count One (FELA negligence), Count Three ( fraud, constructive fraud, and misrepresentation), Count Six (fraudulent concealment), and Count Twelve (seeking rescission of the releases).

> false and material statements of the railroad's authorized representatives made to deceive the employee as to the contents of the release.

Dice, 342 U.S. at 362 (emphasis added). Plaintiffs contend that BNSF's reliance on Dice is misplaced because "Dice was a fraudulent inducement case, not a case limited to a claim of fraud relating to the contents of the release." (Pls.' Mem. Opp'n Mot. to Dismiss at 8.) Plaintiffs assert that there is a difference between cases involving "fraud in the inducement," on the one hand, and "fraud going to the contents of the release," on the other. Plaintiffs contend that the language in Dice "about 'fraud going to the contents of the release' was not meant to limit or restrict the common law rule that a release may be set aside if induced by fraud." (Id. at 11.) Thus, Plaintiffs argue, this Court is not so limited in determining whether they have stated a claim upon which relief can be granted.

In Dice, a railroad fireman was seriously injured following the derailment of an engine on which he was working. Dice, 342 U.S. at 360. In exchange for a payment of $924.63, Dice signed a document that he believed to be a receipt for back wages, based upon statements made by the railroad's claim agent. Id. Although Dice could read, he did not read the document he signed, which in fact released the railroad in full from liability for his injuries. Id. Dice subsequently filed suit against the railroad under the FELA in state court, which had concurrent jurisdiction over FELA negligence claims. A jury found in favor of Dice, necessarily determining that the railroad had obtained the release from Dice by fraud. Id. The trial court, however, entered a judgment in favor of

the railroad, notwithstanding the jury verdict in favor of Dice, finding that the facts alleged did not sustain the allegations of fraud by "clear, unequivocal, and convincing evidence." Id. The Ohio Supreme Court ultimately sustained the trial court's ruling.

Justice Black identified three errors made by the Ohio Supreme Court in sustaining the trial court's actions: (1) the Ohio Supreme Court incorrectly held that Ohio (rather than federal) law governed the validity of the release Dice had signed; (2) it incorrectly applied the Ohio rule of law stating that an employee who was literate but failed to read the release he signed was bound by that release, even though his employer had led him to sign it by deliberately misrepresenting to him the nature of the document; and (3) it erred in disregarding the jury's findings that the release had been obtained through fraud. Id. at 361-63. From these errors, Dice stated three rules of law:

1. federal law, not state law, governs the validity of FELA releases, id. at 361;

2. "the correct federal rule is that . . . a release of rights under the [FELA] is void when the employee is induced to sign it by the deliberately false and material statements of the railroad's authorized representatives made to deceive the employee as to the contents of the release," id. at 362; and

3. whether an employee was induced to sign a FELA release by such false and material statements is a question for the jury, not the judge. Id. at 363.

Plaintiffs equate the "deliberately false and material statements of the railroad's authorized representatives made to deceive the employee as to the contents of the release"

language in Dice with "fraud in the factum" under Ohio law and contend that "[t]he Ohio Supreme Court recognized that Dice was a fraudulent inducement case." (Pls.' Mem. Opp'n Mot. to Dismiss at 10.) The distinction Plaintiffs attempt to draw between "fraud in the factum" and "fraud in the inducement" is unpersuasive, however, because it rests upon Ohio, as opposed to federal, law. It also misreads Dice. The federal rule announced in Dice explicitly states that certain deliberately false and material statements will void a release of rights under the FELA "when the employee is induced to sign" the release by those statements. Dice, 342 U.S. at 362 (emphasis added). The Supreme Court was well aware that Dice presented a "fraudulent inducement" case and treated it as such.

This Court concludes that the Supreme Court meant what it said in Dice and the "correct federal rule" is that a FELA release may be set aside upon a showing that the employee was induced to sign the release due to "the deliberately false and material statements of the railroad's authorized representatives made to deceive the employee as to the contents of the release." Id. at 362 (emphasis added). The issue to be resolved on BNSF's motion to dismiss, therefore, is whether Plaintiffs have alleged facts consistent with a claim that they were induced to sign their releases as a result of deliberately false and material statements that deceived them as to the contents of those releases.

### 2. False statements made to deceive the employee as to the contents of the release

BNSF asserts that Plaintiffs have not pleaded any statements made by the

railroad's claims representatives that could have deceived Plaintiffs as to the contents of the releases they signed. Few lower courts have actually applied the rule stated in Dice in deciding whether a FELA release is void.[13] Thus, there is little guidance for marking the boundaries of what constitutes a "deliberately false and material statement . . . made to deceive the employee as to the contents of the release."

The releases here state the sum to be paid to each Plaintiff in exchange for that individual's release of "any and all claims, suits, demands, actions, damages, costs and expenses of any kind, known or unknown, which I have by reason of any occupational hearing loss, hearing impairment, tinnitus, or hearing disorders of any type, including any increased risk of further hearing disorder," or terms to that effect. (Albritton Aff. Exs. A,

---

[13] In Loose v. Consolidated Rail Corp., the trial court concluded that fraud tending to deceive the plaintiff as to the contents of a FELA release could not be inferred from the fact that, about two months before he signed the release, the railroad's claim agent had told him "there was no reason . . . to see a lawyer" and that the claim agent "would take care of everything." 534 F. Supp. 260, 263 (E.D. Pa.), aff'd, 692 F.2d 749 (3d. Cir. 1982) (table). Loose was decided on summary judgment, however, not on a motion to dismiss.

In Fournier v. Canadian Pacific Railroad Co., the Second Circuit Court of Appeals concluded that inferences of fraud or mistake in connection with the FELA release could properly be drawn from the facts presented to the district court. Fournier signed a document reciting that he was releasing all claims arising out of the accident in which he was injured; he understood, however, from negotiations that took place before he signed the release that the $916 payment he was to receive only pertained to a claim for back wages, leaving open the issue of potential damages for injuries. 512 F.2d 317, 318 (2d Cir. 1975). In reversing the district court's dismissal of Fournier's complaint on summary judgment, the Second Circuit observed that "it might reasonably be concluded that the railroad's representative made statements that were calculated to persuade Fournier that claims for back wages were all that he was to release." Id.

C & D; see also id., Ex. B.) Each release further states that the Plaintiff understands that the release is intended to be the final settlement of all claims involving the hearing conditions described above. (Id.) Plaintiffs complain that the BNSF claims representatives intentionally told them an untruth – that the sums they were receiving in settlement of their claims (as stated in the releases) were "set," "capped," and otherwise limited by a predetermined chart or formula; the claims representative could not offer more in settlement than the amount established by the chart/formula. In the case of Plaintiffs Larson and Johnson, the Amended Complaint also alleges that BNSF's claims representatives falsely stated that the dollar amounts to be paid in settlement of their claims had been determined using values set by the American Medical Association. All of the Plaintiffs complain that the claims representatives told them – falsely – that the values reflected in the chart or formula used for their claim applied "system-wide" to everyone at BNSF, whether represented by an attorney or not.

Taking as true Plaintiffs' allegations and given the plain language of the Supreme Court's holding in Dice, this Court cannot conclude as a matter of law that the false representations pleaded by Plaintiffs could not be found to be deliberately false and material statements made by BNSF's claims representatives to deceive Plaintiffs as to the contents of their releases. Dismissal under Rule 12(b)(6) on the grounds that the alleged

misrepresentations are not actionable under Dice is therefore inappropriate.[14] The Court turns next to BNSF's argument that the releases themselves preclude Plaintiffs from stating a claim upon which relief can be granted.

### 3. The Integration Clauses in the Releases.

BNSF contends that Plaintiffs are barred from complaining that they relied on any oral misrepresentations made by the claims representatives during settlement negotiations because each release contained a clause providing that the release represents the complete agreement between the parties and was entered into by Plaintiff "without reliance upon any statement or representation by [the railroad] or its employees, except such representations as are set forth in this Release." (See, e.g., Albritton Aff. Ex. A.) Furthermore, each Plaintiff represented that he had read and fully understood the release. (Id. Exs. A-D.) Therefore, BNSF argues, Plaintiffs cannot claim to have relied on misrepresentations made outside of the release itself to establish fraud and the fraud claims in the Amended Complaint must fail.

The legal basis for BNSF's argument is a number of securities cases in which the courts of appeals for the First Circuit, District of Columbia Circuit, and Seventh Circuit have held that non-reliance clauses in stock purchase agreements preclude any recovery under the federal securities laws for alleged pre-contractual oral misrepresentations.

---

[14] The Court does not venture an opinion at this stage of the proceedings as to whether the fraudulent inducement claims could survive a motion for summary judgment.

Rissman v. Rissman, 213 F.3d 381 (7th Cir. 2000); Jackvony v. RIHT Fin. Corp., 873 F.2d 411 (1st Cir. 1989); One-O-One Enterps. Inc. v. Caruso, 848 F.2d 1283 (D.C. Cir. 1988). In Rissman, the principal case relied upon by BNSF, the Seventh Circuit rejected a claim based upon a promise allegedly made during the negotiation of a stock purchase agreement that was not incorporated in the written contract. The court of appeals reasoned that federal securities law "does not permit a party to a stock transaction . . . to say, in effect, 'I lied when I told you I wasn't relying on your prior statements' and then to seek damages for their contents." 213 F.3d at 383. Judge Easterbrook expressed his concern that "[s]tock transactions would be impossibly uncertain if federal law precluded parties from agreeing to rely on the written word alone." Id. He observed that the non-reliance clause "ensures that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication." Id. at 384.

Plaintiffs respond by citing to Dice v. Akron, Canton & Youngstown R.R. Co., 342 U.S. 359 (1952), and two Eighth Circuit cases in which the plaintiff was allowed to present parol evidence to establish a claim of fraud in the inducement. Gopher Oil Co. v. Union Oil Co., 955 F.2d 519 (8th Cir. 1992); Pinken v. Frank, 704 F.2d 1019 (8th Cir. 1983). The Eighth Circuit cases, however, involved state law claims of fraud and cited state court precedent to support the holding that the parol evidence rule does not preclude a showing of fraudulent inducement to enter into an agreement. Gopher Oil, 955 F.2d at

526 (citing Minnesota cases); Pinken, 704 F.2d at 1022 (citing Missouri cases). State law principles cannot control issues relating to the validity of a FELA release. See Dice, 342 U.S. at 361-62. Thus, the Court returns to the Dice opinion.

In Dice, the Supreme Court held that the Ohio Supreme Court erred in applying to the railroad employee a rule of law stating that an employee who can read a contract with his employer but fails to do so is bound by that contract, even where the employee was induced to sign that document by deliberately false statements. Id. at 362. The Dice Court concluded that the "[a]pplication of so harsh a rule to defeat a railroad employee's claim is wholly incongruous with the general policy of the [FELA] to give railroad employees a right to recover just compensation for injuries negligently inflicted by their employers." Id. The Supreme Court also noted that the rule applied by the Ohio Supreme Court was "out of harmony with modern judicial and legislative practice to relieve injured persons from the effect of releases fraudulently obtained." Id. Thus, while the Supreme Court could have adopted the Ohio rule of law as the federal rule applicable to challenges to the validity of FELA cases, it did not.

A comparison of the Dice decision and Judge Easterbrook's ruling in Rissman reveals several key distinctions. The federal security laws at issue in Rissman do not purport to provide relief for a class of persons adjudged by Congress to have inadequate remedies at common law for physical harm sustained in the workplace. This Court is mindful that the FELA is to be construed liberally to effectuate its remedial purposes.

Rissman also did not involve the release of a federal cause of action under such a remedial statute. Furthermore, Judge Easterbrook recognized that the parties in Rissman could have avoided litigation through negotiation: "Instead of taking the maximum [defendant] was willing to pay unconditionally, [plaintiff] could have sought a lower guaranteed payment . . . plus a kicker if [the family business] were sold or taken public." Rissman, 213 F.3d at 384. Thus, the extra-contractual promise at issue in Rissman -- that the family business would not be sold or taken public -- could have been incorporated into the agreement. Taking the allegations of fraud in the Amended Complaint as true, the Plaintiffs here could not have similarly avoided litigation. If the railroad did make deliberately false and material statements to the Plaintiffs to induce them to sign their releases, it is wholly unreasonable to expect that the railroad would voluntarily incorporate such knowingly false statements into the release agreements.

The Court concludes that it would defeat the general policy of the FELA to apply a rule that, as a matter of law, a written anti-reliance clause in a FELA release automatically precludes a subsequent challenge to the validity of a release based upon extra-contractual misrepresentations. The Court does not, however, hold that an anti-reliance clause in a FELA release is irrelevant to the inquiry of whether there was reasonable reliance on the alleged misrepresentations. Such a clause may be considered by the finder of fact along with the other circumstances of the settlement negotiations.

### C. Negligent Misrepresentation

Plaintiffs also complain that BNSF's claims representatives failed to use reasonable care or competence in obtaining or communicating information to them concerning their need for legal representation and the basis on which their NIHL claims were being settled. (Amended Compl. ¶¶ 160-68.) As set forth at the beginning of this section, there are three narrow bases recognized under federal law for invalidating a FELA release: negligent misrepresentation of fact is not one of them. Furthermore, Plaintiffs cannot pursue a state common law claim for negligent misrepresentation as a means of undoing the FELA releases they signed. See Counts v. Burlington Northern R.R. Co., 896 F.2d 424, 425-26 (9th Cir.) (dismissing state law claim of fraud in the inducement of a FELA release), cert. denied, 498 U.S. 815 (1990). Accordingly, the Court will dismiss Count Four of the Amended Complaint for failure to state a claim upon which relief can be granted.

## III. Plaintiffs' Fiduciary Duty Claims

Plaintiffs also seek relief on the grounds that (a) the conduct of BNSF's claims representatives gave rise to a fiduciary relationship between the railroad and Plaintiffs; (b) BNSF breached several of its fiduciary duties to Plaintiffs during the negotiation and settlement of their NIHL claims; and (c) BNSF's breaches of fiduciary duty caused harm

to the Plaintiffs – namely, they settled their claims on unfavorable terms.[15] As a threshold matter, therefore, Plaintiffs must establish that a fiduciary relationship existed between them and the defendant railroad. BNSF has attacked Plaintiffs fiduciary duty claims on the ground that, as a matter of law, no such fiduciary relationship existed

Whether a fiduciary relationship exists is determined by looking to state law. See Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 906 F.2d 1206, 1215 (8th Cir. 1990). Under Minnesota law, "[a] fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." Kennedy v. Flo-Tronics, Inc., 274 Minn. 327, 331, 143 N.W.2d 827, 830 (1966). "A fiduciary relationship is not established simply by a long acquaintance between the parties, or by plaintiff merely having faith and confidence in defendant where plaintiff should have known defendant was representing an adverse interest." Southern Minn. Mun. Power Agency v. City of St. Peter, 433 N.W.2d 463, 468 (Minn. Ct. App. 1988) (citing Kennedy, 274 Minn. at 331, 143 N.W.2d at 830).

BNSF argues that it cannot have assumed fiduciary duties vis-a-vis the Plaintiffs with respect to the settlement of their NIHL claims because the settlement of such claims necessarily involves the compromise of adverse positions held by the employee, on the one hand, and the employer BNSF, on the other hand. Thus, Plaintiffs should have

[15] These arguments are embodied in Count Two (breach of fiduciary duty), Count Five (breach of a duty to disclose material facts), and Count Seven (equitable estoppel) of the Amended Complaint.

known that the claims representatives, as agents of the defendant employer, were representing an adverse interest. Plaintiffs respond that a fiduciary relationship can exist between adversaries in a settlement negotiation, relying principally upon Stark v. Equitable Life Assurance Soc., 285 N.W. 466 (1939).

In Stark, the plaintiff had an insurance policy with the defendant which provided that if the plaintiff became wholly and permanently disabled before reaching age sixty, the insurance company would waive subsequent premiums and pay him a monthly disability annuity. Stark was illiterate and had limited business experience, which both the insurance company and its local agent knew. In fact, for years before Stark submitted a claim on the policy, he and the local agent had been close friends and business acquaintances. The policy also provided that Stark did not need to hire any person, firm or corporation to collect insurance or secure any other benefits under the policy; all Stark had to do was write to the company or contact the nearest authorized agent, "whose duty is to facilitate all settlements without charge." 285 N.W. at 467. Stark became totally and permanently disabled while the policy was in effect and so informed the local agent, requesting his disability benefits under the policy. Id. The local agent denied Stark's claim on the grounds that he was not bedridden, a requirement that did not appear in the policy. Id. Ultimately, Stark's policy lapsed because he no longer had the money to pay the premiums. Id.

Stark had alleged he had great respect for the local agent, borne out of their long-

standing relationship, and had implicit trust and confidence in him. 285 N.W. at 467-68. The Minnesota Supreme Court concluded, however, that such facts are not sufficient, as a matter of law, to establish a confidential or fiduciary relation between the parties because Stark "should know that the insurance agent was representing adverse interests." 285 N.W. at 470. Rather, the critical fact for the Minnesota Supreme Court, was the policy provision telling Stark that he did not have to hire counsel to obtain his benefits but rather could simply contact the local agent, whose duty it was to facilitate all settlements without charge. "Apart from this provision, the insurance company was under no obligation to inform the insured of his legal rights under the contract." 285 N.W. at 470.

As in Stark, Plaintiffs' allegations that they placed their trust in the BNSF claims representatives is insufficient as a matter of law to establish a fiduciary relationship because the Plaintiffs should have known that the claims representative for the railroad represented an adverse interest. Plaintiffs quote several passages from a BNSF handbook entitled "If You're Injured on the Job" to establish that BNSF's claims representatives had undertaken a duty to settle employees' claims "fairly"; there are no allegations, however, that any of the Plaintiffs read the handbook before signing their releases. Other allegations in the Amended Complaint purporting to evidence the existence of a fiduciary relationship and, hence, fiduciary duties owed to Plaintiffs by the railroad, similarly do

not directly correlate to the claims asserted by the named Plaintiffs.[16]

Plaintiffs therefore are left with their allegations that the claims representatives they dealt with told them that hiring an attorney was a waste of money because an attorney would not bring about a larger settlement for them and would in fact eat into the "capped" amounts they could receive. While these representations may be actionable as fraudulent, they are not comparable to the explicit assumption of a duty found in the Stark case. The Court further notes that, unlike Stark, the Plaintiffs here are literate and have not alleged that they had a long-standing relationship with the claims representatives with whom they dealt. Rather, each Plaintiff had two or three conversations with the claim representative, of which at most one was face-to-face.

The existence of a fiduciary relationship is generally a question of fact. Minnesota Timber Producers v. American Mut. Ins. Co. of Boston, 766 F.2d 1261, 1268 (8th Cir. 1985), cert. denied, 474 U.S. 1059 (1986). The Court has carefully reviewed the Amended Complaint, however, which measures fifty-nine pages (without attachments) and contains over two hundred twenty paragraphs, and concludes that the individual Plaintiffs have failed to adequately plead the existence of a fiduciary relationship out of which fiduciary duties would run from BNSF to the Plaintiffs. Accordingly, the Court

---

[16] These allegations pertain to deposition testimony given in the 1980s by a retired BNSF attorney in another lawsuit (the transcript of which apparently cannot be photocopied and which none of the Plaintiffs alleges to have read before settling his NIHL claims), and deposition testimony from a BNSF claims agent with whom none of the Plaintiffs dealt (and who was deposed after Plaintiffs had settled their NIHL claims).

will dismiss Counts Two, Five and Seven of the Amended Complaint.

## IV. Plaintiffs' Remaining Common Law Claims

The remaining claims asserted in the Amended Complaint seek to enforce BNSF's alleged promise to pay Plaintiffs "the same settlements for similar levels of hearing loss" as BNSF paid to other employees who were represented by counsel.[17] Plaintiffs seek either an award of monetary damages or equitable relief that would result in BNSF paying Plaintiffs the difference between what they in fact received in settlement of their NIHL claims and what other BNSF employees received for "comparable" NIHL claims under the "highest matrix" of settlement values BNSF used to settle such claims.

BNSF argues that these common law claims are preempted by the FELA because they are "nothing but FELA claims seeking FELA damages, i.e., personal injuries allegedly sustained while working on a railroad." (Def.'s Reply Br. at 12.) BNSF criticizes Plaintiffs for failing to articulate what their non-FELA damages could possibly be. (Id.) Plaintiffs have, however, described a measure of damages that does not call for personal injury damages. BNSF also argues that claims arising out of "bad faith settlement practices" are pre-empted by the FELA. The causes of action pleaded in Counts Eight through Eleven of the Amended Complaint are not dependent upon proof of "bad faith." Rather, they begin with the premise that a settlement agreement is a

---

[17] These claims are reflected in Count Eight (promissory estoppel), Count Nine (specific performance), Count Ten (breach of contract), and Count Eleven (unjust enrichment) of the Amended Complaint.

contract, the breach of which may be remedied by a claim for damages. Plaintiffs have alternatively pled that the promise that was allegedly broken was either a part of the settlement contract (giving rise to a breach of contract action) or otherwise enforceable under theories of promissory estoppel or unjust enrichment. From the foregoing, the Court concludes that these claims, while novel, do theoretically state a claim upon which relief could be granted.[18]

## Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that Defendant Burlington Northern & Santa Fe Railway Company's Motion to Dismiss the Plaintiffs' initial Complaint (Doc. No. 13) is **DENIED AS MOOT**. Defendant Burlington Northern & Santa Fe Railway Company's Motion to Dismiss the Amended Complaint (Doc. No. 33) is **GRANTED IN PART** as follows:

1. The individual Plaintiffs' claims asserted in Counts Two, Four, Five and Seven of the Amended Complaint are **DISMISSED WITH PREJUDICE**; and

2. To the extent Count Three seeks relief from the FELA releases on the basis of state common law fraudulent misrepresentation, that claim is also **DISMISSED WITH PREJUDICE**.

---

[18] Whether such claims can survive a motion for summary judgment is an issue for another day.

The Defendant's Motion to Dismiss is **DENIED** with respect to the remaining counts of the Amended Complaint.

Dated: January 10, 2002

RICHARD H. KYLE
United States District Judge