UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Duane Larson, Ronald Morris, Jr., Robert Cogger, and Thomas Fisher, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

Civ. No. 01-527 (JNE/RLE)
ORDER

The Burlington Northern and Santa Fe Railway Company,

Defendant.

---

Russell A. Ingebritson, Esq., Kathyrn M. Kohn, Esq., and Phillip Arnold, Esq., Ingebritson & Associates, L.L.P., and Richard A. Lockridge, Esq., Lockridge Grindal Nauen P.L.L.P., appeared for Plaintiffs Duane Larson, Ronald Morris, Jr., Robert Cogger, and Thomas Fisher, individually and on behalf of all others similarly situated.

Weston W. Marsh, Esq., and John Z. Lee, Esq., Freeborn & Peters LLP, and Edward M. Glennon, Esq., and Christopher H. Yetka, Esq., Lindquist & Vennum, P.L.L.P., appeared for Defendant The Burlington Northern and Santa Fe Railway Company.

---

Duane Larson, Ronald Morris, Jr., Robert Cogger, and Thomas Fisher (collectively, Plaintiffs) brought this action against Burlington Northern and Santa Fe Railway Company (BNSF) under the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51-60 (2000). The case is before the Court on Plaintiffs' Motion for Class Certification and BNSF's motions for summary judgment with respect to the individual plaintiffs. For the reasons set forth below, the Court declines to certify a class and concludes that BNSF is entitled to summary judgment.

## I. BACKGROUND

For a detailed recitation of the allegations in this case, see *Larson v. Burlington Northern & Santa Fe Railway*, Civ. No. 01-527, 2002 WL 47005 (D. Minn. Jan. 10, 2002). Briefly, Plaintiffs are former or current employees of BNSF who executed releases without legal

representation to settle claims arising from work-related noise-induced hearing loss (NIHL). According to Plaintiffs, BNSF represented that retention of a lawyer would not do them any good because the value of their claims was set by a formula and that they would receive the same monetary settlement for their claims as other BNSF employees with comparable claims. Plaintiffs seek to set aside the releases or to obtain the same amount of money that BNSF employees who were represented by counsel received in settling their NIHL claims. Pursuant to the Court's Order of January 10, 2002, which granted in part BNSF's motion to dismiss the Amended Complaint, the following claims remain: FELA negligence (Count One); federal common law fraud, constructive fraud, and misrepresentation (Count Three); federal common law fraudulent concealment (Count Six); federal common law promissory estoppel (Count Eight); federal common law specific performance (Count Nine); federal common law breach of contract (Count Ten); federal common law unjust enrichment (Count Eleven); and federal common law rescission (Count Twelve). Plaintiffs now move to certify the following class:

> All current or former employees of Defendant who suffered work-related hearing injuries and who settled their resulting Federal Employers Liability Act claims without legal representation, in which a Burlington Northern created settlement Worksheet was used. This settlement process was utilized from approximately 1989 to the present ("Class Period").

Plaintiffs identify three issues on which they seek class certification: (1) whether the releases should be rescinded; (2) BNSF's liability in the underlying negligence claim; and (3) whether BNSF is equitably estopped from asserting the statute of limitations under FELA. BNSF opposes the motion for class certification and moves for summary judgment.

## II. DISCUSSION

### A. Class certification

To certify a class, the class must be so numerous that joinder of all members is impracticable, there must be questions of law or fact common to the class, the claims or defenses of the representative parties must be typical of those of the class, and the representative parties must fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition to satisfying Rule 23(a), a party seeking class certification must demonstrate that the action falls within one of the three categories of Federal Rule of Civil Procedure 23(b). In this case, Plaintiffs seek certification under Rule 23(b)(3), which provides that an action may be maintained as a class action if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

*1. Rule 23(a)*

Plaintiffs assert that joinder of all members of the proposed class is impracticable because there are over 7,000 members. BNSF does not dispute that Plaintiffs satisfy the numerosity requirement of Rule 23(a). Accordingly, the Court turns to whether there are questions of law or fact common to the class.

The commonality requirement of Rule 23(a) "does not require that every question of law or fact be common to every member of the class." *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561 (8th Cir. 1982). Rather, the requirement "may be satisfied, for example, 'where the question of law linking the class members is substantially related to the resolution of the litigation even though individuals are not identically situated." *Id.* (quoting *Am. Fin. Sys., Inc. v. Harlow*, 65

F.R.D. 94, 107 (D. Md. 1974)). The commonality requirement "is easily met in most cases because it 'requires only that the course of conduct giving rise to a cause of action affects all class members, and that at least one of the elements of that cause of action is shared by all members.'" *Egge v. Healthspan Servs. Co.*, 208 F.R.D. 265, 268 (D. Minn. 2002) (quoting *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 575 (D. Minn. 1995)). Here, there are common questions of law and fact, including whether the releases should be set aside because they were based on BNSF's hearing loss calculation worksheet. BNSF responds by pointing out numerous issues requiring individualized inquiry. BNSF's response is more appropriately addressed in connection with the analysis of whether common questions predominate over individualized questions. The Court concludes that Plaintiffs satisfy the commonality requirement.

Next, Plaintiffs maintain that the typicality requirement is satisfied because Plaintiffs and the proposed class members experienced NIHL due to BNSF's negligence, the settlements reached by Plaintiffs and the proposed class were based on a hearing loss calculation worksheet, and similar representations were made to Plaintiffs and the proposed class members to persuade them to settle their claims. In response, BNSF contends that Plaintiffs have unique claims and are subject to unique defenses. For instance, BNSF notes that Plaintiffs' claims present individualized issues because three different claim agents negotiated their settlements over the course of six years. The Eighth Circuit Court of Appeals summarized the law governing the inquiry into the typicality requirement as follows:

> Typicality under Rule 23(a)(3) means that there are "other members of the class who have the same or similar grievances as the plaintiff." The burden is "fairly easily met so long as other class members have claims similar to the named plaintiff." Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory.

*Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996) (citations omitted). Here, the claims arise out of exposure to loud noises while working for BNSF and the execution of releases based on BNSF's hearing loss calculation worksheet. Although there are factual variations in the individual claims, the Court concludes that Plaintiffs have satisfied the typicality requirement.

Finally, the adequacy requirement of Rule 23(a) focuses on whether the class representatives have common interests with the class and whether the class representatives will vigorously prosecute the interests of the class through qualified counsel. *Paxton*, 688 F.2d at 562-63. Plaintiffs assert that their interests coincide with those of the class members and that they do not have interests antagonistic to any other class member. Plaintiffs maintain that they and the members of the proposed class: (1) are current or former employees of BNSF; (2) suffered NIHL giving rise to FELA claims; (3) settled their FELA claims without representation of counsel; (4) received settlement offers based, at least in part, on BNSF's settlement worksheet; and (5) have been damaged and are seeking compensation for their damages. They also assert that their counsel are well qualified to prosecute this action. BNSF responds that neither Plaintiffs nor their counsel will adequately represent the interests of the proposed class. BNSF contends that Plaintiffs are not adequate representatives because they are not familiar with the claims and have ceded control of the litigation to counsel. Although Plaintiffs may lack detailed knowledge of the pleadings, they have demonstrated a general understanding of the facts of this case and have common interests with members of the proposed class. With regard to Plaintiffs' counsel, they are experienced class-action attorneys who have demonstrated their ability and willingness to prosecute this action. The Court concludes that Plaintiffs satisfy the adequacy requirement.

*2. Rule 23(b)(3)*

Having found that Plaintiffs meet the requirements imposed by Rule 23(a), the Court turns to whether Plaintiffs satisfy Rule 23(b)(3). The first inquiry of Rule 23(b)(3) is whether common issues predominate over individual ones:

> There are no bright lines for determining whether common questions predominate. Instead, considering the facts of the case presented, a claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position.

*Lockwood Motors*, 162 F.R.D. at 580 (citations omitted).

With regard to Plaintiffs' claim for rescission, FELA provides that "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void." 45 U.S.C. § 55. "[A] release is not a device to exempt from liability but is a means of compromising a claimed liability." *Callen v. Penn. R.R.*, 332 U.S. 625, 631 (1948). Under the FELA, "a release of rights . . . is void when the employee is induced to sign it by the deliberately false and material statements of the railroad's authorized representatives made to deceive the employee as to the contents of the release." *Dice v. Akron, Canton & Youngstown R.R.*, 342 U.S. 359, 362 (1952).[1] According to Plaintiffs, common issues predominate over individual ones because BNSF employed a standardized fraudulent scheme to settle the NIHL claims of Plaintiffs and the proposed class members. BNSF disputes whether the negotiations were standardized. In this case, individual negotiations took place between claim agents and the proposed class members. Notwithstanding their assertion that BNSF employed a standardized

---

[1] A release of rights under FELA may also be set aside due to inadequate consideration or mutual mistake. *Larson*, 2002 WL 47005, at *6. Plaintiffs do not allege that the releases are invalid because of mutual mistake or inadequate consideration. *Id.* at *7 & n.8.

scheme to settle the claims, Plaintiffs acknowledge that representations made during the negotiations varied. The variations in the representations made during the negotiations necessitate an individualized inquiry into whether a claim agent made deliberately false and material statements as to the contents of the release to a claimant. In addition, an individualized inquiry into whether the allegedly false statements induced the claimant to sign the release would be required. In short, Plaintiffs' claim for rescission requires an individualized inquiry into more than 7,000 negotiations such that common issues do not predominate over individual ones.

A similar conclusion is warranted with respect to whether BNSF is equitably estopped from asserting the statute of limitations. FELA provides that an action must be commenced "within three years from the day the cause of action accrued." 45 U.S.C. § 56. A party defending against a FELA claim may be equitably estopped from asserting the statute of limitations "if misrepresentations by either it or its agent caused the employee's failure to bring his action within the three-year period." *Fletcher v. Union Pac. R.R.*, 621 F.2d 902, 906 (8th Cir. 1980); *see Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232-35 (1959). Estoppel does not apply where the employee does not rely on the misrepresentation. *Fletcher*, 621 F.2d at 906. Again, uniform representations were not made to the members of the potential class. To determine whether BNSF is equitably estopped with respect to a particular claimant, an individualized inquiry into when the cause of action accrued, what misrepresentations were made to the claimant by BNSF, when BNSF made those misrepresentations, and whether the claimant relied on those misrepresentations would be required for over 7,000 individuals. Accordingly, the Court concludes that common issues do not predominate over individual ones with respect to Plaintiffs' assertion that BNSF is equitably estopped from asserting the statute of limitations.

As to BNSF's liability in the underlying negligence claim, Plaintiffs argue that BNSF is collaterally and judicially estopped from denying that the injuries to the hearing of Plaintiffs and the proposed class members were caused by a single act of common negligence. "The doctrine of judicial estoppel is intended to prohibit a party from taking inconsistent positions in the same or related litigation." *Asa-Brandt, Inc. v. ADM Investor Servs., Inc.*, 344 F.3d 738, 745 (8th Cir. 2003). "Collateral estoppel is appropriate when: (1) the issue sought to be precluded is identical to the issue previously decided; (2) the prior action resulted in a final action on the merits; (3) the party sought to be estopped was either a party or in privity with a party to the prior action; and (4) the party sought to be estopped was given a full and fair opportunity to be heard on the issue in the prior action." *Canady v. Allstate Ins. Co.*, 282 F.3d 1005, 1016 (8th Cir. 2002). Here, the statements upon which Plaintiffs rely to establish the applicability of judicial or collateral estoppel are summaries of allegations made against BNSF. The statements do not reveal that BNSF admitted that NIHL injuries were caused by a single act of negligence. Plaintiffs have not demonstrated the applicability of either doctrine. Furthermore, BNSF's liability in the underlying negligence claim turns on the myriad issues of fact requiring individualized inquiry such as how much noise a claimant was exposed to and for how long. Common issues therefore do not predominate over individual ones with regard to BNSF's liability in the underlying negligence action.

Rule 23(b)(3) also requires Plaintiffs to demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Plaintiffs argue that the many common issues, the relatively modest size of most class members' claims, the absence of a competing putative class action involving members of the proposed class, the concentration of class members in Minnesota, and the absence of any unusual difficulties in

managing the action reveal that a class action is superior to other methods of resolving the dispute. BNSF responds that the trial of this case as a class action would be unmanageable, that members of the proposed class have sufficient incentive to pursue claims individually, and that there is no class-wide methodology available to assess damages. In the Court's view, individualized inquiries into the facts and circumstances of more than 7,000 members of the class will overwhelm the litigation were it to proceed as a class. Plaintiffs have not demonstrated that a class action is the superior method by which to proceed.

In short, questions of law or fact common to the members of the class do not predominate over questions affecting individual members. A class action is not superior to other available methods for the fair and efficient adjudication of the controversy. Accordingly, the Court denies Plaintiffs' Motion for Class Certification.

**B. Summary judgment as to the individually named plaintiffs**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a

court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

*1. Robert Cogger*

Cogger started to work for BNSF in 1976 as a laborer. From 1976 to 1992, Cogger asserts that he was exposed to loud noises from a variety of machines. He first started to wear hearing protection in the late 1980s because the protection was not available in the early years of his employment at BNSF. In 1992, Cogger submitted a claim for hearing loss. In December, he met with a BNSF claim agent, John Herlick, for less than two hours. During that meeting, Cogger executed a release that provides in part:

> 1. In consideration of [$2,250], I release and discharge [BNSF] from any and all claims, suits, demands, actions, damages, costs and expenses of any kind, known or unknown, which I have by reason of any occupational hearing loss, hearing impairment, tinnitus, or hearing disorders of any type, including any increased risk of further hearing disorder.
>
> 2. I understand that the injuries and illnesses listed in paragraph 1 of this Release are or may be permanent. I further understand that these injuries or illnesses may progress, and that recovery therefrom is uncertain and indefinite. It is my intention to release [BNSF] from any and all future consequences of said injuries or illnesses.
>
> . . . .
>
> 6. I understand this Release is the complete agreement between [BNSF] and me. I make this Release without reliance upon any statement or representation by [BNSF] or its employees, except as are set forth in this Release.
>
> 7. I understand and agree that this Release is intended as a final settlement of all claims, known or unknown, involving the illnesses or injuries listed in paragraphs 1 and 2 above.

Above his signature, Cogger wrote: "I have read and fully understand this release."

At his deposition, Cogger described his meeting with Herlick. According to Cogger, Herlick showed Cogger a graph that represented what BNSF was willing pay. In addition,

Herlick stated that Cogger did not need to retain an attorney because an attorney would not obtain a higher offer. Cogger also testified that he understood in 1992 that the release foreclosed any claim for hearing loss that he had, that he was "led to believe that there would be no more money for hearing loss after this particular claim," that he did not have an agreement with Herlick apart from the release, and that he understood paragraph 7 of the release. Cogger testified that Herlick lied by stating that Cogger would not receive a higher settlement even if represented by an attorney and that the amount offered was as much as Herlick could offer.

BNSF argues that it is entitled to summary judgment on Cogger's claims because the release executed by Cogger is valid and bars his claims. Again, FELA provides that "[a]ny contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void." 45 U.S.C. § 55. "[A] release is not a device to exempt from liability but is a means of compromising a claimed liability." *Callen*, 332 U.S. at 631. Under the FELA, "a release of rights . . . is void when the employee is induced to sign it by the deliberately false and material statements of the railroad's authorized representatives made to deceive the employee as to the contents of the release." *Dice*, 342 U.S. at 362. A party challenging the validity of a FELA release bears the burden of proving its invalidity. *Callen*, 332 U.S. at 630.

Case law provides guidance as to what constitutes a deliberately false and material statement made to deceive an employee as to the contents of a release. An employer makes such a statement by presenting a general release as one that applies to a limited number of potential claims, *see Fournier v. Canadian Pac. R.R.*, 512 F.2d 317, 318 (2d Cir. 1975) (per curiam) (holding that district court erred in granting summary judgment to railroad on issue of general release's validity where release presented as one that applied only to claim for back wages), or

by presenting a release as something other than a release, *see Dice*, 342 U.S. at 360-61, 364 (injured railroad fireman executed general release after railroad presented it as receipt for back wages); *Marshall v. N.Y. Cent. R.R. Co.*, 218 F.2d 900, 904 (7th Cir. 1955) (reversing directed verdict in favor of railroad where plaintiff executed release "on the representation that it was a receipt and thought she was being paid for expenses, without any intention of releasing [the railroad] from liability"); *Camerlin v. New York Cent. R. Co.*, 199 F.2d 698, 702-03 (1st Cir. 1952) (reversing summary judgment in favor of railroad where plaintiff executed release in reliance on claim agent's representation that release was a receipt for workers' compensation benefits and medical bills). In *Loose v. Consolidated Rail Corp.*, 534 F. Supp. 260 (E.D. Pa. 1982), *aff'd*, 692 F.2d 749 (3d Cir. 1982) (unpublished table decision), the district court held that fraud tending to deceive the plaintiff as to the contents of a FELA release could not be inferred from the fact that, approximately two months before the release's execution, the railroad's claim agent stated that there was no reason for the plaintiff to see a lawyer and that the claim agent would take care of everything. *Id.* at 263.

In this case, the alleged misrepresentations relate to the method used by BNSF to calculate the amount offered, but they do not relate to the contents of the release. BNSF did not present the release to Cogger as something other than a release. Nor did BNSF misrepresent the scope of the claims covered by the release. Cogger knew that he was executing a release, that the release applied to his claim for hearing loss, and that he was settling the claim for $2,250. Having afforded Cogger the opportunity to conduct discovery in this case, the Court must now address the issue upon which the Court declined to venture an opinion in the Order of January 10, 2002. *Larson*, 2002 WL 47005, at *12 n.14. Viewing the record in the light most favorable to Cogger, no reasonable finder of fact could conclude that the alleged misrepresentations

deceived Cogger as to the contents of the release. Accordingly, BNSF is entitled to summary judgment on Cogger's claims that seek to set aside the release.

As to the FELA claim, Cogger alleges that BNSF negligently caused his hearing loss. Because he released BNSF from "any and all claims . . . of any kind, known or unknown, which [he has] by reason of any occupational hearing loss," the Court concludes that the valid release entitles BNSF to summary judgment on this claim.

Turning to the common law claims, they depend on the assertion that BNSF promised to pay Cogger an amount comparable to that received by others with similar hearing loss. Because the release is valid, the release is the "complete agreement," the release is "intended as a final settlement," and Cogger was "led to believe that there would be no more money for hearing loss after this particular claim," the Court concludes that BNSF is entitled to summary judgment on these claims.

*2. Thomas Fisher*

From 1974 to 1980, Fisher worked for BNSF as a laborer. Since 1980, he has worked for BSNF as a machine operator. He operated several types of equipment, including rail saws, generators, hydraulic ratchets, and compressors. He started to use hearing protection equipment by 1980. He first became aware of his hearing loss in 1992 or 1993 when he could not hear a low battery signal in a smoke detector. In 1993, he submitted a hearing loss claim to BNSF. In August, Fisher met with a BNSF claim agent, Jeffrey Johnson, for 30 to 35 minutes to negotiate a settlement. During that meeting, Fisher executed a release that provides in part:

> 1. In consideration of [$3,000], I release and discharge [BNSF] from any and all claims, suits, demands, actions, damages, costs and expenses of any kind, known or unknown, which I have by reason of any occupational hearing loss, hearing impairment, tinnitus, or hearing disorders of any type, including any increased risk of further hearing disorder.

> 2. I understand that the injuries and illnesses listed in paragraph 1 of this Release are or may be permanent. I further understand that these injuries or illnesses may progress, and that recovery therefrom is uncertain and indefinite. It is my intention to release [BNSF] from any and all future consequences of said injuries or illnesses.
>
> . . . .
>
> 6. I understand this Release is the complete agreement between [BNSF] and me. I make this Release without reliance upon any statement or representation by [BNSF] or its employees, except as are set forth in this Release.
>
> 7. I understand and agree that this Release is intended as a final settlement of all claims, known or unknown, involving the illnesses or injuries listed in paragraphs 1 and 2 above.

Above his signature, Fisher wrote: "I have read and fully understand the above release."

At his deposition, Fisher described his meeting with Johnson. Johnson offered to settle Fisher's claim for either $1,800 or $3,000. Fisher responded that he would settle if Johnson quadrupled the offer. Johnson declined, stating that American Medical Association (AMA) guidelines determined the value of his settlement. Although impressed by the reference to the AMA, Fisher knew nothing about the AMA when he met with Johnson. Johnson also told Fisher that Fisher did not need to retain an attorney, though Fisher knew that he could have retained one. The only document shown to Fisher during his meeting with Johnson was the release. Fisher admitted that he had read the release, that he knew the document he signed was a release that related to his claim for hearing loss, that he would receive $3,000 pursuant to the release, that he understood the release was final, and that the settlement created no expectation other than receiving the stated amount. According to Fisher, Johnson misrepresented that BNSF used an AMA formula to determine settlement amounts and that the formula applied without regard to whether the claimant was represented by an attorney.

According to BNSF, the alleged misrepresentations made by Johnson to Fisher do not relate to the contents of the release. Because the release is valid, BNSF argues that Fisher's claims are barred. The alleged misrepresentations made by Johnson to Fisher relate to the method used by BNSF to calculate the settlement offer. They do not relate to the contents of the release. BNSF did not present the release as something other than a release. Nor did BNSF misrepresent the scope of the claims covered by the release. Fisher knew that he was executing a release, that the release applied to his claim for hearing loss, and that he was settling his claim for $3,000. Viewing the record in the light most favorable to Fisher, no reasonable factfinder could conclude that the alleged misrepresentations deceived Fisher as to the contents of the release. Consequently, BNSF is entitled to summary judgment on Fisher's claims to set aside the release.

As to the FELA claim, Fisher alleges that BNSF negligently caused his hearing loss. Because he released BNSF from "any and all claims . . . of any kind, known or unknown, which [he has] by reason of any occupational hearing loss," the Court concludes that the valid release entitles BNSF to summary judgment on this claim.

Turning to the common law claims, they rest on the assertion that BNSF promised to pay Fisher an amount comparable to that received by others with similar hearing loss. Because the release is valid, the release is the "complete agreement," the release is "intended as a final settlement," and Fisher did not expect to receive anything other than $3,000, the Court concludes that BNSF is entitled to summary judgment on these claims.

*3. Ronald Morris, Jr.*

Morris has worked for BNSF since 1978 as a section man or machine operator. Throughout his employment at BNSF, Morris has been exposed to loud noises. He first started

to wear hearing protection when BNSF made it available, though he cannot recall when BNSF made the hearing protection available. In October 1998, Morris submitted a hearing loss claim to BNSF. He recalled that at least one phone call and at least one meeting took place between him and a BNSF claim agent, William Renney. On October 23, 1998, Morris executed a release that provides in part:

> For and in sole consideration of [$3,000], . . . I, Ronald A. Morris, the undersigned, release, discharge, and acquit [BNSF] from liability for personal injury, which has developed, or which may develop in the future, from any and all injuries and/or diseases to my ears, inner ears, or head resulting in an impairment of my ability to hear which has resulted or which may in the future result from my past exposures to noise and/or trauma effecting my hearing while working as a railroad employee.
>
> . . . .
>
> This release is fully understood by me and constitutes the entire agreement between the parties hereto. This release is executed solely for the consideration above expressed, without any other representation, promise or agreement of any kind whatsoever and [BNSF] denies any and all liability.
>
> This is not a receipt for wages. It is a general release.
>
> I further hereby acknowledge that I have entered into this compromise settlement and have made, executed and delivered this Release with full knowledge and understanding of the nature and legal effect of each of the same and of all my rights. I have read this Release and fully understand the same as explained to me by my attorney. . . .
>
> I have read and understand this two page release.

At his deposition, Morris described his negotiation with Renney. According to Morris, Renney stated that the settlement value was $3,000. Morris asked how Renney had calculated that figure. Renney responded that a formula used by BNSF set the value at $2,500 and that Renney was increasing it $500.[2] Renney also said that the formula applied without regard to

---

[2] Later in his deposition, Morris acknowledged that the amount set by the formula was $2,000, and that Renney increased the settlement to $3,000.

whether a claimant was represented by an attorney. Morris asked to see a copy of the formula and Renney mailed the hearing loss calculation worksheet to Morris. By letter dated October 16, 1998, Renney reiterated the settlement amount and sent a release to Morris:

> According to the formula for hearing loss that we use, you do have some high frequency loss. Your low frequency is good. According to the formula you are entitled to a settlement of $2,000.00. I am raising this to $3,000.00.
>
> Enclosed please find the release agreement. . . . Send me the signed original and I will send you the check.

Morris acknowledged that he had read the release, that he knew it was a release that applied to his claim for hearing loss, that the release settled his claim for $3,000, and that he had no agreement with Renney apart from the release. Morris maintains that he relied on Renney's misrepresentations regarding the formula in signing the release. Asked what Renney said about the formula, Morris responded:

> Just what I said earlier, that this is a BNSF formula, this is how he come to the numbers that, the amount of money for the numbers for my hearing, and that's what this was explained to me. And something about this AMA. Which now I guess I've got an idea who it is, but I still don't understand it, you know, what they do or stuff.

BNSF contends that it is entitled to summary judgment because the alleged misrepresentations do not relate to the contents of the release. Because the release is valid, BNSF argues that Morris's claims are barred. The alleged misrepresentations made by Renney to Morris relate to how BNSF calculated the settlement offer, but they do not relate to the contents of the release. BNSF did not present the release to Morris as something other than a release. BNSF did not misrepresent the scope of the claims covered by the release. Morris knew that he was executing a release, that the release applied to his claim for hearing loss, and that he was settling the claim for $3,000. Viewing the record in the light most favorable to Morris, no reasonable finder of fact could conclude that the alleged misrepresentations deceived him as to

the contents of the release. Thus, BNSF is entitled to summary judgment on Morris's claims to set aside the release.

As to the FELA claim, Morris alleges that BNSF negligently caused his hearing loss. Because he released BNSF from liability for personal injury from injuries to his ears resulting in a hearing impairment, the Court concludes that the valid release entitles BNSF to summary judgment on this claim.

Turning to the common law claims, they rely on the assertion that BNSF promised to pay Morris an amount comparable to that received by others with similar hearing loss. Because the release is valid, the release is the "complete agreement," and Morris acknowledged that he had no agreement with Renney apart from the release, the Court concludes that BNSF is entitled to summary judgment on these claims.

*4. Duane Larson*

Larson started to work for BNSF in 1967 as an agent operator or agent telegrapher. In that position, he copied train orders and took messages that were transmitted to him via a headset. Most of the headsets covered one ear and Larson typically wore the headset on his left ear. From 1967 to 1981, Larson used a headset every day at work. In 1981, the responsibilities of agent operators and clerks were combined. From 1981 to 1987, Larson used a headset at least 50% of his time at work. In late 1987, Larson was transferred to a position that did not require him to use a headset. He has not worn a headset at work since the transfer.

In 1991 or 1992, Larson noticed ringing in both of his ears. He also had difficulty hearing other people speaking to him in the presence of background noise. BNSF tested Larson's hearing as part of its hearing conservation program in 1992. A few weeks after the test, Larson received a letter directing him to contact the terminal manager's secretary. The secretary

told Larson to contact a claim agent, William Renney. On August 25, 1992, Larson completed a hearing impairment questionnaire in which he stated that he thought he had a work-related hearing problem because his use of the headset subjected him to "many high squeals—lightning strikes etc." Two days later, he met with Renney for approximately two hours. During that meeting, Larson executed a release that states in part:

> 1. In consideration of $4,000, I release and discharge [BNSF] from any and all claims, suits, demands, actions, damages, costs and expenses of any kind, known or unknown, which I have by reason of any occupational hearing loss, hearing impairment, tinnitus, or hearing disorders of any type, including any increased risk of further hearing disorder.
>
> 2. I understand that the injuries and illnesses listed in paragraph 1 of this release are or may be permanent. I further understand that these injuries or illness may progress, and that recovery therefrom is uncertain and indefinite. It is my intention to release [BNSF] from any and all future consequences of said injuries or illnesses.
>
> . . . .
>
> 6. I understand this Release is the complete agreement between [BNSF] and me. I make this Release without reliance upon any statement or representation by [BNSF] or its employees, except such representations as are set forth in this Release.
>
> 7. I understand and agree that this Release is intended as a final settlement of all claims, known or unknown, involving the illnesses or injuries listed in paragraphs 1 and 2 above.

Above his signature, Larson wrote: "I have read and fully understand this release of two pages."

At his deposition, Larson described his meeting with Renney and the execution of the release. According to Larson, Renney completed a hearing loss calculation worksheet. After reviewing the worksheet with Larson, Renney told Larson the value of Larson's claim. Renney said that the AMA had set standards or established a formula and that Renney used the standards or formula to calculate the settlement value. Renney informed Larson that Larson was free to retain an attorney, though the settlement would not change. When he signed the release, Larson

had read it, understood that it was a release that applied to his claim for hearing loss, believed that the release was final, and understood that he was settling his claim for $4,000. Larson asserts that that he relied on Renney's misrepresentations that the settlement value was based on a formula or standards established by the AMA, that his claim was worth $4,000, and that the settlement would not change even if Larson retained an attorney.

BNSF contends that it is entitled to summary judgment because the alleged misrepresentations do not relate to the contents of the release. Because the release is valid, BNSF argues that Larson's claims are barred. The alleged misrepresentations made by Renney relate to how BNSF calculated the settlement offer, but they do not relate to the contents of the release. BNSF did not present the release as something other than a release. BNSF did not misrepresent the scope of the claims covered by the release. Larson knew that he was signing a release, that the release applied to his claim for hearing loss, and that he was settling the claim for $4,000. Viewing the record in the light most favorable to Larson, no reasonable finder of fact could conclude that the alleged misrepresentations deceived him as to the contents of the release. BNSF is therefore entitled to summary judgment on Larson's claims to set aside the release.

As to the FELA claim, Larson alleges that BNSF negligently caused his hearing loss. Because he released BNSF from "any and all claims . . . of any kind, known or unknown, which [he has] by reason of any occupational hearing loss," the Court concludes that the valid release entitles BNSF to summary judgment on this claim.

Turning to the common law claims, they depend on the assertion that BNSF promised to pay Larson an amount comparable to that received by others with similar hearing loss. Because the release is valid, the release is the "complete agreement," the release is "intended as a final

settlement," and Larson understood that he was settling for $4,000, the Court concludes that BNSF is entitled to summary judgment on these claims.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. BNSF's Motion for Summary Judgment Against Plaintiff Robert Cogger [Docket No. 169] is GRANTED.

2. BNSF's Motion for Summary Judgment Against Plaintiff Thomas Fisher [Docket No. 172] is GRANTED.

3. BNSF's Motion for Summary Judgment Against Plaintiff Ronald Morris, Jr., [Docket No. 174] is GRANTED.

4. BNSF's Motion for Summary Judgment Against Plaintiff Duane Larson [Docket No. 178] is GRANTED.

5. Plaintiffs' Motion for Class Certification [Docket No. 187] is DENIED.

6. BNSF's Motion for Summary Judgment Against Plaintiff Duane Larson on the Issue of Causation [Docket No. 222] is DENIED AS MOOT.

7. The Amended Complaint [Docket No. 33] is DISMISSED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 30, 2004

S/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge